885 F.2d 872
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STEELWORKERS OF AMERICA, et al., Plaintiffs-Appellees,
v.
JAEGER ENERGY CORPORATION, Defendant,
and
Charles Grim, Defendant-Appellant.
 No. 87-4106.
 United States Court of Appeals, Sixth Circuit.
 Sept. 22, 1989.
 
 Before ENGEL, Chief Judge, and MERRITT and DAVID A. NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant-appellant Charles Grim, the principal owner and chief executive officer of defendant Jaeger Energy Corporation, occupied the position of a fiduciary with respect to the assets of a certain benefit plan established for company employees pursuant to a collective bargaining agreement. In April of 1981 the company delivered a $30,000 check to Midland Mutual Insurance Company as payment for health insurance that Jaeger was obligated to furnish employees under the plan. Midland Mutual ultimately decided not to issue a policy, and the $30,000 was returned to Jaeger in August of 1981.
 
 
 2
 Jaeger had been suffering serious cash flow problems, and the insurance coverage it was supposed to maintain for its employees had lapsed early in 1980 because of non-payment of premiums. Coverage was not reinstated until November of 1981. During the interim a number of employees incurred personal liability for health care expenses that ought to have been covered by insurance but, because of Jaeger's financial problems, were not. Jaeger paid a portion of these expenses directly, but as of June 30, 1984, according to an exhibit authenticated by Jaeger's controller, the unpaid expenses still totaled more than $63,000.
 
 
 3
 When the $30,000 came back to Jaeger from Midland Mutual in August of 1981, Mr. Grim did not segregate the money and see that it was used exclusively for health care purposes. Instead, he allowed the $30,000 to be co-mingled with Jaeger's general operating funds. The propriety of that action was drawn in question in the lawsuit subsequently brought against Jaeger and Mr. Grim by the employees who had been shortchanged and by their collective bargaining representative.
 
 
 4
 In the decision now before us on appeal, the district court held that the $30,000 returned by Midland Mutual belonged to the employee benefit plan; that Mr. Grim was a fiduciary with respect to this money; and that he was personally liable to account for it. No proper accounting having been made, judgment was rendered against Mr. Grim in the amount of $30,000.
 
 
 5
 In appealing, Mr. Grim does not challenge any of the district court's factual findings. He points out, however, that the corporate account in which the $30,000 was deposited in August of 1981 was presumably the same account on which Jaeger presumably drew three months later to pay for the health insurance put in place at that time. He also notes that between August of 1983 and June of 1984, Jaeger made payments of approximately $38,000 against health care expenses incurred by the employees during the period when no insurance had been in force; these payments, too, presumably came from Jaeger's general operating account. On the strength of all this, Mr. Grim argues that his duty to account for the $30,000 has been fully satisfied.
 
 
 6
 We are not persuaded. It may be true that Jaeger spent more than $30,000 on health care costs after August of 1981, but the critical question, it seems to us, is whether the employees were left in as good a position as they would have been in if the trust funds had not been co-mingled with the operating funds. There has been no showing that the co-mingling did not harm the interests of employees, and the normal inference, we think, would be that at least some harm occurred.
 
 
 7
 For purposes of illustration, let us suppose that Jaeger's operating receipts, not counting the $30,000 returned by Midland Mutual, came to $500,000 between August of 1981 and January 30, 1982, the expiration date of the collective bargaining agreement. Suppose further that the company's operating expenses during that period came to $1 million, and that the company's creditors were being paid 50 cents on the dollar. And suppose, finally, that the health care portion of the company's operating expenses came to $100,000. Under this hypothesis, would it have made any difference to the employees whether the $30,000 check from Midland Mutual was co-mingled with the general operating funds?
 
 
 8
 It could well have made a difference, in our opinion. The $30,000 ought to have been spent entirely on health care. If that had been done, the health care costs remaining to be paid from the corporation's general operating account would have been $70,000. Assuming payment at 50 cents on the dollar, the total spent on health care would have been $65,000 ($30,000 in trust funds returned by Midland Mutual and $35,000 from general corporate funds), and the health care deficit would have been only $35,000. With co-mingling of the trust funds, however, Jaeger would have had a total of $530,000 to spend, health costs would have been paid at a rate of 53 cents on the dollar, and the health care deficit would have been $47,000. The co-mingling would thus have lowered health care expenditures by $12,000.
 
 
 9
 If Mr. Grim had put an accountant on the stand to show that the co-mingling did in fact reduce health care expenditures by only $12,000, or by some other amount less than $30,000, and if the testimony had been accepted by the district court, Mr. Grim's liability would have been reduced accordingly. There was no such testimony, however--and the wrongful co-mingling unquestionably having occurred, we are unwilling to assume that health care expenditures were not penalized.
 
 
 10
 Mr. Grim might have argued, perhaps, that the money returned by Midland Mutual was dedicated to the procurement of insurance, and that if $30,000 was actually spent on insurance premiums between August of 1981 and the expiration date of the collective bargaining agreement, it could have made no difference to the employees whether the premiums were paid out of a special account or out of a general operating account. But whatever the merits of such an argument might be in theory, Mr. Grim failed to show that any specific dollar amount was in fact spent on insurance premiums during the relevant time period. We note also that disbursement of the $38,000 applied against the employees' medical expenses apparently did not occur until well after the expiration date of the collective bargaining agreement. If the $38,000 could be taken into account, finally, it would be offset, in part, by a disbursement of $18,235 made during 1982 to repay loans advanced to Jaeger by Mr. Grim. As a fiduciary who had wrongfully co-mingled trust funds with general corporate funds, it seems to us that until the $30,000 was fully accounted for, Mr. Grim should have seen that the individual employees' expenses were paid before he himself was paid back.
 
 
 11
 The judgment of the district court is AFFIRMED.